Hillsborough County Probate Court
No. 2004-570

## IN THE MATTER OF B.T.

Argued: January 11, 2006
Opinion Issued: February 15, 2006

*Disability Rights Center, Inc.*, of Concord (*Cindy Robertson* and *James Fox* on the brief, and *Mr. Fox* orally), for the respondent.

*Craig, Wenners, Craig and Capuchino*, of Manchester (*Linda Capuchino* on the brief and orally), for the petitioner.

GALWAY, J. The respondent, B.T., appeals an order of the Hillsborough County Probate Court (*Cassavechia*, J.) ordering her involuntary admission to a hospital for purposes of conditional discharge pursuant to RSA chapter 135-C (2005). We reverse.

The record supports the following facts. In June 2004, the petitioner, Jennifer DeVoe of the Mental Health Center of Greater Manchester (MHC), filed a petition in the probate court for the involuntary admission of B.T. At the subsequent hearing, Dr. Timothy Breitholtz, the court-appointed psychiatrist, DeVoe, and B.T. testified; Dr. Breitholtz also filed a report with the court.

The following evidence was presented to the court. B.T. is a woman with a history of mental illness beginning in 1987, when she was first diagnosed with "Schizophreniform Disorder." In 1999, she overdosed on prescribed medications and was hospitalized. During this hospitalization, the probate court ordered her involuntarily admitted for a period not to exceed two years. It is unclear from the record exactly when B.T. was released from the hospital, but she was conditionally discharged prior to the expiration of her two-year admission. In 2001, she was involuntarily admitted again for a period not to exceed three years, expiring on June 4, 2004, but again received a conditional discharge. One condition of her conditional discharge was that she take the medications prescribed by the MHC staff psychiatrist.

In December 2002, B.T. discontinued her required medications on two occasions and experienced what the petition describes as "agitation, pressured speech, and preoccupation with side effects of the medications." Due to her violations of the conditional discharge, her conditional discharge was temporarily revoked. The revocation resulted in B.T.'s admission to New Hampshire Hospital for twenty days. Additionally, in June 2003, DeVoe was informed by B.T. that she had decided on her own to decrease her dosage of a prescribed medication. DeVoe warned B.T. that doing so would violate her conditional discharge and could result in another revocation, which dissuaded B.T. from lowering her medication level.

On May 13, 2004, DeVoe was notified that B.T.'s family members were concerned about her condition. Later that day, the Manchester Police found B.T. "wandering around Hanover Street in Manchester, NH in a confused state and complaining of chest pains." The police took B.T. to the

Catholic Medical Center Emergency Room, where a physician examined her for chest pains and recommended a psychological assessment by MHC. At this assessment, B.T. stated that she was not taking Abilify, a medication prescribed to her by her MHC psychiatrist. This resulted in another temporary revocation of her conditional discharge.

On June 7, 2004, DeVoe filed the instant petition for B.T.'s involuntary commitment, which gave rise to a hearing on July 22, 2004, in the probate court. At the hearing, DeVoe described B.T.'s history of not taking her prescribed medications and testified that in early May 2004, DeVoe received a call from B.T. in which she stated that she planned to stop taking Abilify and planned to take St. John's Wort, prescribed by her homeopathic physician, instead.

Dr. Breitholtz examined B.T. in June 2004 and diagnosed her as having "schizoaffective disorder bipolar type" and "narcissistic personality disorder." His testimony and report state:

> [B.T.] has a long and extensive history of noncompliance with her recommended treatment which has often resulted in rapid decompensation of her mental condition manifested by severe agitation, emotional lability, delusional thinking and paranoid ideation. She expresses minimal insight into her mental condition and I feel without a conditional discharge there is a very high risk of noncompliance with taking her medication . . . . It is my opinion that [B.T.] remains in such a mental condition as a result of mental illness as to create a potentially serious likelihood of danger to herself or others.

The probate court ruled that B.T. was "of such mental condition as a result of mental illness to create a potential serious likelihood of danger to herself." The probate court ordered that B.T. be "admitted to New Hampshire Hospital for a period not to exceed three years for the express purpose of conditional discharge."

B.T. appeals the probate court's order, arguing that the petitioner presented insufficient evidence at the hearing to support an order of involuntary commitment for the purpose of conditional discharge pursuant to RSA 135-C:34 and RSA 135-C:45.

The petitioner responds that she proved by clear and convincing evidence that B.T. posed a danger to herself or others and therefore met the standard of proof under RSA 135-C:34. She also argues that she presented sufficient evidence for an extension of B.T.'s conditional discharge under RSA 135-C:45, III, which requires a lower standard of proof than an initial involuntary commitment.

An overview of the applicable statutory scheme provides a context for our analysis. RSA chapter 135-C, entitled "New Hampshire Mental Health Services System," establishes a system of mental health facilities in New Hampshire and provides for procedures used in the admission, maintenance, and release of individuals involved in that system. *See* RSA 135-C:1, :6, :27-:54. A person may be involuntarily admitted into an approved treatment facility by either involuntary emergency admission (IEA) or nonemergency involuntary admission, which is commonly referred to as an "involuntary admission." RSA 135-C:27, :34; *see also In re Perley*, 137 N.H. 209, 211 (1993) (referring to an RSA 135-C:34 proceeding as an "involuntary admission"). An IEA may only last for a maximum of ten days unless extended. RSA 135-C:31, :32. The maximum duration of an involuntary admission is five years, unless renewed under RSA 135-C:45 or :46. Along with determining the length of the involuntary admission, the probate court shall include an appropriate period of time, if any, to allow for conditional discharge. RSA 135-C:45, II.

Conditional discharge allows a person who has been involuntarily admitted to participate in treatment on an out-patient basis, provided that the patient agrees to abide by the rules of the conditional discharge. RSA 135-C:50. Failure to comply with such rules may result in a temporary or permanent revocation of the conditional discharge, which requires a return to a treatment facility. RSA 135-C:51. A conditional discharge may not exceed the period of time remaining on the involuntary admission ordered by the probate court. RSA 135-C:50, II.

*I. Renewal of Conditional Discharge*

■ We first address DeVoe's argument that she presented sufficient evidence to support an extension of B.T.'s involuntary admission pursuant to RSA 135-C:45, III.

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include.

*Woodview Dev. Corp. v. Town of Pelham*, 152 N.H. 114, 116 (2005) (citations omitted).

RSA 135-C:45, III states:

> *If the respondent is on a conditional discharge at the time of the hearing,* the court may order involuntary admission to a receiving facility, or renew such an order, for the purpose of permitting the respondent to remain on conditional discharge if such treatment is necessary to prevent the recurrence of the circumstances which led to the person's dangerous condition.

RSA 135-C:45, III (emphasis added). This provision expressly requires that the respondent be on a conditional discharge at the time of the hearing. According to the record, B.T.'s latest involuntary admission expired on June 4, 2004, prior to the filing of the instant petition. *Cf.* RSA 135-C:39 (2005). A conditional discharge cannot exceed the period of time remaining on an involuntary admission order. RSA 135-C:51, II. Accordingly, B.T.'s conditional discharge also expired on June 4, 2004. The hearing at issue occurred on July 22, 2004. Since B.T.'s conditional discharge had expired at the time of the hearing, the probate court could not have applied RSA 135-C:45, III to renew the prior order for involuntary admission and conditional discharge.

*II. Admission for the Purposes of Conditional Discharge*

We next address whether DeVoe presented sufficient evidence to support an involuntary commitment for the purposes of conditional discharge. "We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law." *In the Matter of Alexander and Evans*, 147 N.H. 441, 442 (2002). "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (1997). As our analysis also requires statutory interpretation, which is a question of law, we apply our *de novo* standard for statutory interpretation, as stated above.

RSA chapter 135-C permits a court to order admission for the purposes of conditional discharge:

> In any order of admission to a receiving facility, the court shall include in the duration of said order an appropriate period of time, if any, to allow for conditional discharge. Admission for purposes of conditional discharge shall be appropriate when the person has recovered from his mental illness to such an extent that he no longer requires inpatient treatment but a prescribed regimen of medical, psychiatric, or psychological care or treatment is necessary to prevent the recurrence of the circumstances which led to the person's dangerous condition.

RSA 135-C:45, II. The plain language of this statute requires that an order of admission precede an allowance for conditional discharge. Thus, the statutory scheme creates a two-step process for an admission for the purposes of conditional discharge. The respondent must be admitted before he can be released on conditional discharge.

 Because an order of admission for the purposes of conditional discharge requires an initial admission, and a potential readmission, there must be sufficient proof presented at the hearing to support an order for an involuntary admission. The parties agree that the probate court correctly determined that the following was the applicable standard for the involuntary admission in this case:

> The standard to be used by a court, physician, or psychiatrist in determining whether a person should be admitted to a receiving facility for treatment on an involuntary basis shall be whether the person is in such mental condition as a result of mental illness as to create a *potentially serious likelihood of danger to himself or others*.

RSA 135-C:34 (emphasis added). To support such a finding, the petitioner must plead specific acts or actions demonstrating dangerousness. *In re Fasi a/k/a Cass*, 132 N.H. 478, 485 (1989); RSA 135-C:36, I(b). The petitioner must prove dangerousness by clear and convincing evidence. *In re Sandra H.*, 150 N.H. 634, 640 (2004). We will uphold the probate court's ruling unless no rational fact finder could have made the findings by clear and convincing evidence. *Id.* The standard of clear and convincing evidence is significant because "[t]he private interests at stake in civil commitment proceedings, loss of liberty and social stigmatization, are substantial." *In re Richard A.*, 146 N.H. 295, 298 (2001).

 To determine whether the facts support the finding that B.T. poses a potentially serious likelihood of danger to herself or others under RSA 135-C:34, we must define "danger to himself or others" as used in that section. RSA 135-C:34, which governs involuntary admissions, does not specifically define "danger to himself or others," though RSA 135-C:27 does. "Where a term or phrase is not specifically defined, we look to other provisions of the statutory scheme for guidance." *State v. Elementis Chem.*, 152 N.H. 794, 803 (2005). In establishing the criteria for proving either danger to oneself or danger to others, in the context of an IEA, RSA 135-C:27 requires a threat of, a likelihood of, an attempt to inflict, or an actual infliction of "serious bodily injury" to oneself or another or a lack of capacity to care for one's own welfare such that there is a likelihood of serious debilitation if admission is not ordered. RSA 135-C:27. The same

criteria reasonably apply to our analysis of RSA 135-C:34, as both statutes employ similar standards. The standard for an IEA set out in RSA 135-C:27 is: "A person shall be eligible for involuntary emergency admission if he is in such mental condition as a result of mental illness to pose a likelihood of danger to himself or others," which is similar to the involuntary admission standard in RSA 135-C:34. The primary difference is that an IEA requires that the person pose a "likelihood of danger to himself or others," RSA 135-C:27, while the involuntary admission standard requires that the person pose a "potentially serious likelihood of danger to himself or others," RSA 135-C:34. The difference lies in the likelihood of danger, not in what the danger is. We conclude, therefore, that the criteria for dangerousness under RSA 135-C:27 as stated above apply to both types of admissions.

The evidence of B.T.'s dangerousness presented at the hearing was that B.T. had poor insight into her illness and a history of choosing to discontinue her medications. When she did, she experienced what DeVoe and Dr. Breitholtz termed "decompensation," which includes "severe agitation, emotional lability, delusional thinking and paranoid ideation." Additionally, DeVoe presented evidence that, in 1999, B.T. overdosed on pain medications.

The evidence of agitation, delusion, and paranoia that B.T. experiences when off her medication may support a finding that B.T. suffers from a mental illness; however, such symptoms do not make her "dangerous" under RSA 135-C:34 to herself or to anyone else. These symptoms do not satisfy the specific acts or actions required to demonstrate a threat, a likelihood, an attempt, or an actual infliction of "serious bodily injury" on herself or on another. *In re Fasi a/k/a Cass*, 132 N.H. at 485; RSA 135-C:36, I(b). The trial court made no finding that B.T. demonstrated a lack of capacity to care for her own welfare such that there was a likelihood of serious debilitation if admission was not ordered. The evidence simply shows that, when off her medication, B.T. experiences symptoms of mental illness.

"It is the policy of this state that mental illness in and of itself is insufficient to involuntarily admit any person into the mental health services system." RSA 135-C:1, III. We must interpret a statute in light of the policy that the statutory scheme seeks to advance. *Hughes v. N.H. Div. of Aeronautics*, 152 N.H. 30, 38-39 (2005). We may not, therefore, order an involuntary admission based solely on the existence of a mental illness. RSA 135-C:34 requires clear and convincing proof of specific acts demonstrating actual or likely serious bodily injury. We therefore conclude that B.T.'s symptoms of agitation, delusion, disorganized

thinking, and paranoia are insufficient to prove by clear and convincing evidence that B.T. poses a potentially serious likelihood of danger to herself or to others.

■ The physical manifestations of B.T.'s mental illness, specifically, her walking on a street complaining of chest pains and her overdose in 1999, are also insufficient to prove her present or future dangerousness. The record reveals no likelihood of serious bodily injury caused by B.T.'s claims of chest pains or her walking on a street.

■ B.T.'s overdose, on the other hand, was undoubtedly a specific act that had the potential to cause her serious bodily injury. The overdose occurred approximately five years prior to the hearing, however. The trial court may attach substantial weight to past actions demonstrating dangerousness, but whether the actions are sufficiently recent or sufficiently similar to affect the court's determination will depend upon the nature and circumstances of the act and the history of the respondent. *In re Fasi a/k/a Cass*, 132 N.H. at 485. Proof of the commission of past dangerous acts is not tantamount to proof of present dangerousness. *Id.* at 484. Such acts merely help to predict the possibility of future dangerousness. *Id.* Since B.T.'s overdose in 1999, she has discontinued her medication multiple times and there is no evidence of a subsequent overdose. Her overdose is neither recent nor similar to the events that gave rise to the petition, and therefore has insufficient probative value for determining her future dangerousness.

■ Additional evidence of B.T.'s dangerousness presented at the hearing was Dr. Breitholtz's expert opinion that B.T. met the involuntary commitment standard. Dr. Breitholtz's report and testimony assert that B.T. poses a potentially serious likelihood of danger to herself or others due to her mental illness. We have held, however, that "a psychiatrist's finding of a dangerous mental condition does not automatically operate to trigger commitment; without evidence of dangerous conduct, even the most persuasive psychiatrist's report is insufficient to justify commitment." *Id.* at 484 (quotations omitted). Despite Dr. Breitholtz's expert opinion, there cannot be an involuntary commitment without clear and convincing evidence of specific acts or actions demonstrating a potentially serious likelihood of dangerousness.

Though we recognize that B.T. might benefit from medical treatment for her illness, she cannot be deprived of her personal liberty by an involuntary commitment without clear and convincing proof of her

dangerousness. We hold that the evidence submitted to the trial court was insufficient as a matter of law to support the finding of dangerousness.

*Reversed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.